1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SEAN L. JOYNER,                              No.  2:15-cv-1494 MCE CKD P

12                     Petitioner,

13          v.                                      FINDINGS AND RECOMMENDATIONS

14    WILLIAM MUNIZ,

15                     Respondent.

16

17          Petitioner, a state prisoner, is proceeding through counsel with a petition for writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his 2012 conviction for second

19    degree murder and related enhancements, for which he was sentenced to a prison term of 40 years

20    to life.  (ECF No. 1.)  Respondent has answered the petition (ECF No. 11), and petitioner has

21    filed a traverse.  (ECF No. 14.)

22          Upon careful consideration of the record and the applicable law, the undersigned will

23    recommend that the petition be denied for the reasons set forth below.

24                                        BACKGROUND

25          In its affirmation of the judgment on appeal, the California Court of Appeal, Third

26    Appellate District, recounted the facts of petitioner's conviction:

27                   Around 2 a.m. on October 23, 2009, victim David Blanks was
                     fatally shot six times in a nightclub parking lot. The circumstances
28                   of the shooting were these: As Blanks was leaving the nightclub,

                                                    1

someone asked him, "[W]hat's up Blood?" Blanks replied, "[W]hat's up 'cuz?" "Blood" was a reference to the Blood criminal street gang and "cuz" was a reference to the rival Crip criminal street gang. One Nicholas Newsome started "mugging" (making mean faces at) Blanks. Newsome was an Oak Park Blood. Someone asked Blanks where he was from, to which he responded, "29th Street," as Blanks was an affiliate of the 29th Street Crip gang. Others, including Newsome and defendant Sean Joyner, yelled out, "nigga, this is Oak Park." Defendant was also an Oak Park Blood. Blanks turned around, and someone repeatedly shot him.

The day after the shooting, defendant texted Damanique McCoy, the mother of his three-year-old son, the following: "[B]abe, please. This is real serious. I fucked up. I think it's over, babe. On God, on my son, I didn't mean to do it." She responded, "[W]hat's over?" Defendant texted, "Babe, I fucked up. But on God I didn't mean to do it." During a conversation McCoy had with a police detective, she told the detective that defendant told her, "some guy got shot at [the nightclub]," "it was an accident," and he (defendant) was there. When she asked if he was the shooter, he would not tell her and said he did not want to talk about it. [1]

[FN 1:  McCoy had the conversation with defendant while they were both at the police station.  The only reason McCoy went to the police station is because police lied to her and told her defendant wanted to speak to her.]

Defendant and Newsome were both tried together in front of a jury for first degree murder with enhancements that at least one principal personally discharged a firearm and the murder was committed for the benefit of the Oak Park Bloods. [2]

[FN 2:  In closing, the People argued Newsome was the shooter and defendant was the aider and abettor, based on at least one witness identifying Newsome as the shooter.  There was also evidentiary support for an argument that defendant was the shooter.  According to the trial testimony of at least one witness, there was a man with an outstretched hand from which flashes emanated just before the witness heard shots being fired, and that man was dark skinned (defendant was dark skinned at the time of the shooting, and Newsome was light skinned).  The jury specifically found not true an allegation that Newsome personally discharged the firearm. Although Newsome appealed his conviction to this court, his appeal was ultimately dismissed.]

A jury found defendant (and Newsome) guilty of second degree murder and, as to defendant, found true the murder was committed for the benefit of the Oak Park Bloods and that at least one principal personally discharged a firearm. The trial court sentenced defendant to 40 years to life in prison.

////

////

2

1  (Lod. Doc. 4 at 1-3.[1])

2  Following a jury trial in the Sacramento Superior Court, a jury convicted petitioner of

3  second degree murder (Cal. Penal Code § 187(a)[2]), found true that the crime was committed for

4  the benefit of a criminal street gang (§ 186.22(b)(1)), and found that a principal discharged a

5  firearm causing great bodily injury (§ 12022.53(e)(1)).  (1 CT 20, 2 CT 375-376, 390.)

6  On May 24, 2012, the trial court sentenced petitioner to a state prison term of 15 years to

7  life for the murder, plus 25 years to life for the firearm allegation, for an aggregate sentence of 40

8  years to life.  (1 CT 23, 2 CT 410-411.)

9  On October 25, 2013, the California Court of Appeal for the Third Appellate District

10  affirmed the judgment as to petitioner.  (Lod. Doc. 4.)  On January 15, 2014, the California

11  Supreme Court denied the petition for review.  (Lod. Doc. 6.)

12  Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which

13  was denied on July 8, 2015.  (Lod. Docs. 7-8.)

14  Petitioner filed the instant federal petition on July 12, 2015.  (ECF No. 1.)

15  ANALYSIS

16  I. AEDPA

17  The statutory limitations of federal courts' power to issue habeas corpus relief for persons

18  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

19  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

20
21  > An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
22

23  > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
24

25  > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
26

27  [1] See ECF No. 15 (Respondent's Notice of Lodging Documents in Paper).

28  [2] All further references are to the California Penal Code unless otherwise stated.

3

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

////

4

1   The undersigned also finds that the same deference is paid to the factual determinations of

2   state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

3   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

4   decision that was based on an unreasonable determination of the facts in light of the evidence

5   presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §

6   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

7   factual error must be so apparent that "fairminded jurists" examining the same record could not

8   abide by the state court factual determination. A petitioner must show clearly and convincingly

9   that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

10   The habeas corpus petitioner bears the burden of demonstrating the objectively

11   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

12   Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state

13   court's ruling on the claim being presented in federal court was so lacking in justification that

14   there was an error well understood and comprehended in existing law beyond any possibility for

15   fairminded disagreement." Harrington, supra, 131 S. Ct. at 786-787. Clearly established" law is

16   law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van

17   Patten, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique situations will not

18   qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established

19   law not permitting state sponsored practices to inject bias into a criminal proceeding by

20   compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards

21   does not qualify as clearly established law when spectators' conduct is the alleged cause of bias

22   injection). The established Supreme Court authority reviewed must be a pronouncement on

23   constitutional principles, or other controlling federal law, as opposed to a pronouncement of

24   statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

25   The state courts need not have cited to federal authority, or even have indicated awareness

26   of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8. Where the state

27   courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

28   court will independently review the record in adjudication of that issue. "Independent review of

5

the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim.  Id. at 1097.

II.  Petitioner's Claims

A.  Ineffective Assistance

1.  Claim

Petitioner claims his trial counsel was ineffective for failing to suppress the police recording of petitioner's conversation with his child's mother, Daminique McCoy, which took place after petitioner requested that an attorney be present for further questioning.  (ECF No. 1 at 17-24.)  Petitioner claims he was prejudiced by counsel's deficient performance, as his jailhouse conversation with McCoy "was the centerpiece of the prosecution's case in an otherwise weak case."  (ECF No. 1 at 22.)

As recounted by the court of appeal, petitioner and his friends encountered Blanks outside a nightclub on October 23, 2009.  After a brief exchange of words, Blanks was fatally shot.

The next day, petitioner texted McCoy: "'[B]abe, please.  This is real serious.  I fucked up.  I think it's over, babe.  On god, on my son, I didn't mean to do it."  McCoy responded: "[W]hat's over?"  Petitioner texted: "Babe, I fucked up.  But on God I didn't mean to do it."

Petitioner's codefendant Newsome was arrested on October 25, 2009, and a warrant was obtained to search his cell phone records.  (2 CT 398-99.)  Reviewing Newsome's phone records, police discovered the above texts between petitioner (using Newsome's phone) and McCoy.  (2 CT 399-400.)

////

6

1    Petitioner was arrested on January 20, 2010. (2 CT 400.) Sacramento Detective Higgins

2    read him his Miranda rights. (Pet. Ex. C, ECF No. 1-4.) Petitioner denied knowing anything

3    about the shooting and said he was home at the time. After Higgins told him he was being

4    investigated for first degree murder, petitioner said: "I need a lawyer then cause this is not right."

5    Higgins stopped questioning petitioner, but told him that McCoy "want[ed] to say goodbye" and

6    would be coming to talk with him for a few minutes. (Id.)

7    McCoy was waiting at the station to see petitioner. As the court of appeal noted, "The

8    only reason McCoy went to the police station is because the police lied to her and told her

9    defendant wanted to speak with her." (Lod. Doc. 4 at 2, n.1.) Prior to seeing petitioner, McCoy

10   was questioned by Detective Higgins. (2 RT 415-534.) In a lengthy interview, she provided

11   detailed information about her interactions with petitioner the day after Blanks was killed.

12   Higgins summarized her statements as follows:

13          DET. HIGGINS:  Okay, let me make sure I got this kind of right. . .
14          . [S]o that day you get a text message from Sean, you don't
            recognize the number. You wake up to that message, you were
15          supposed to go to breakfast that day, that's why you reacted the
            way you did. We text back and forth. You don't know what he
16          was talking about. He told you to go to the Motel 6 by Denny's . . .
            [Y]ou end up at the Motel 6 on Hambra . . . He said, I think I
17          fucked up, it was an accident. I didn't mean to do it, you're like, do
            what – he said, someone got shot at Center Court. We said, what
18          does that mean? What does – were you there?  He said, yeah, I was
            up – you said, who else, he said a whole bunch of us. So what
19          happened, he said a whole bunch of people were there and then the
            gun went off. You said, who had the gun, did you have the gun, did
20          you pull the trigger. And he's like, Daminique, I don't want to talk
            about it. I said, what does that mean, did you do it? And he said, I
21          don't want – I don't want to talk about it, I just want to hold you.
            He said, uh, he shouldn't have been there. He just wanted to hold
22          you, he was depressed, sad, looked like he was going, like
            remorseful really bad. Then you guys went to Togos –

23          D. MCCOY:  Mm-hmmm.

24   (2 RT 531-32.) After the interview, Higgins sent McCoy in to talk with petitioner.

25   McCoy's conversation with petitioner, which lasted over an hour, was monitored by

26   police. (Pet. Ex. B, ECF No. 1-3; 2 CT 415-482.) McCoy tearfully apologized to petitioner for

27   her statements to Higgins, saying "now it's gonna look like I sent you to jail." (2 RT 422.)

28   Petitioner and McCoy agreed that she had been tricked into telling Higgins something that was

                                            7

1    not true.  Petitioner repeatedly urged McCoy to tell family members to inform police that

2    petitioner had been home on the night of the shooting.

3              At trial, defense attorney Lisa Franco filed a motion in limine to exclude, among other

4    evidence, "any statements made by defendant Joyner made while in custody during a recorded

5    conversation by police detectives after he had asked for an attorney stated to Dominique McCoy

6    be excluded because they are hearsay and made in violation of <u>Miranda</u>."  (1 CT 272.)  The trial

7    court's hearing on this portion of the motion proceeded as follows:

8              THE COURT:   [A]pparently Mr. Joyner invoked his right to a
              lawyer at some point during questioning.
9

10             MS. FRANCO:  Correct.

11             THE COURT:  Then the officers left him in a room by himself.

12             MS. FRANCO:  Correct.

13             THE COURT:   And then at some point brought in or allowed
              somebody named Dominique McCoy to – to enter the room.

14             MS. FRANCO:  Correct.

15             THE COURT:  And they recorded a conversation.  There's no law
              enforcement involved in questioning but Dominque McCoy and
16             Defendant Joyner have a conversation of some kind?

17             MS. FRANCO:  Correct.

18             THE COURT:  And your motion is 1.2, that's <u>Miranda</u> violation.
              And do you have any support for fact that – that it would be
19             violation of his <u>Miranda</u> rights since there is no custodial
              questioning?  I mean, he's clearly in custody, it sounds like, but
20             there is no questioning by a government agent.

21             MS. FRANCO:  It's my understanding that anything that – I don't
              think there is any admissions made or anything spoken after he
22             invoked to the officer.  [Withdraws that portion of the motion.]
              And then at that point the officer left and then that's the other part
23             that I – we had talked about earlier.  That's withdrawn.

24             THE COURT:  Okay.  So number 28 . . . will be withdrawn, the
              entire motion?
25
              MS. FRANCO:  That's correct.
26
              THE COURT:  Without prejudice you – you may bring it up later
27             or object to it based on how [the prosecutor] decides how to present
              that evidence.
28

8

MS. FRANCO:  Thank you.  Correct.

(1 RT 158-159.)

The prosecutor played the entire recording of McCoy's jailhouse conversation with

petitioner for the jury.  (3 RT 879-882.)  In closing argument, she stated:

> Then they put [Joyner and McCoy] in that room together, and that's
> when we know it's the truth, right? . . . She starts crying.  I told
> him you were there.  I told him you told me that you were at Center
> Court.  Does Sean Joyner ever say what on earth did you ever tell
> them that for?  I never told you that. . . . He says . . . you got to tell
> them.  You got to tell them that I was at home babysitting.  Why is
> he trying to convince her that she has to go lie to the police?  Why
> is he doing that?  Because he was at Center Court.
>
> . . .
>
> And when you go through those interviews and those tapes and you
> look at the quality and the truth coming out in them, in spite of
> what [McCoy] said here, you're gonna hold him accountable for
> killing David Blanks[.]

(5 RT 1251-1252.)

After petitioner's conviction, his habeas counsel asked Ms. Franco (then Ms. Murillo)

why she withdrew the motion to suppress petitioner's conversation with McCoy.  "Ms. Murillo

stated that she wanted the Joyner/McCoy conversation excluded, and that she had no strategic

reason for withdrawing the motion to exclude the Joyner/McCoy conversation.  She did not

remember withdrawing the motion but added that the only reason she would have done so was

because she believed that the district attorney would not offer the conversation at trial."  (Pet. Ex.

D (Quinn Decl.), ECF No. 1-5 at 7.)

2. State Court Opinions

Petitioner first raised his ineffective assistance claim as to the McCoy conversation on

direct appeal.  Rejecting this claim, the state court of appeal reasoned:

> Defendant contends trial counsel was ineffective for failing to
> suppress the recording of his conversation with McCoy in which he
> made incriminating statements to McCoy. He argues counsel had
> no tactical reason for not making an argument pursuant to Miranda
> v. Arizona (1966) 384 U.S. 436 (Miranda) and that the recording
> violated his Fifth Amendment rights. "Miranda requires that a
> suspect be given certain advisements to preserve the privilege

9

against self-incrimination, or to ensure its voluntary and intelligent waiver, during the inherently coercive circumstances of a 'custodial interrogation.' " (People v. Webb (1993) 6 Cal.4th 494, 525–526.)

Counsel was not ineffective because her performance was not deficient. (See People v. Waidla (2000) 22 Cal.4th 690, 718 [counsel's deficient performance is the first prong of an ineffective assistance of counsel analysis].) Miranda warnings do not apply even when a suspect's girlfriend, at police direction, tape records conversations in which she elicited admissions concerning the homicide. (People v. Webb, supra, 6 Cal.4th at pp. 524–526.) Here, the situation was even more remote than in Webb. McCoy did not record the conversation and elicit incriminating statements at police direction. Rather, she talked to defendant because police told her (incorrectly) that defendant said he wanted to talk with her, so she went to the police station to talk with him.

(Lod. Doc. 4 at 6.)

Petitioner next asserted this claim in a petition for habeas corpus in the California Supreme Court, which was summarily denied. (Lod. Docs. 7-8.)

3. Legal Standards

The California Supreme Court's summary denial of this claim on habeas review constitutes a denial on the merits; thus, the decision is subject to AEDPA review. See Sully v. Ayers, 725 F.3d 1057, 1067, n.4 (9th Cir. 2013) (summary denial by California Supreme Court constitutes an adjudication on the merits, even without evidentiary hearing); Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims. See Strickland v. Washington, 466 U.S. 668 (1984). First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690. The court must then determine, whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. Second, a defendant must affirmatively prove prejudice. Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability

1  sufficient to undermine confidence in the outcome." Id.  See also United States v. Murray, 751

2  F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir.

3  1984) (per curiam).

4         As to ineffective assistance claims in the federal habeas context, the Supreme

5  Court has instructed: "The standards created by Strickland and § 2254(d) are both 'highly

6  deferential,' . . . and when the two apply in tandem, review is 'doubly' so[.] . . . . When §

7  2254(d) applies, the question is not whether counsel's actions were reasonable. The question is

8  whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

9  Richter, 562 U.S. at 105 (internal citations omitted).

10  4.  Analysis

11         Petitioner argues that defense attorney Franco's failure to suppress the jailhouse

12  conversation with McCoy fell "outside the wide range of professional competent assistance"

13  under Strickland.  Respondent counters that a reasonable jurist could find that the jailhouse

14  conversation was not coercive interrogation prohibited by the Fifth Amendment, and that any

15  motion to suppress would have been denied.

16         Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

17  Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).  "[C]oercive police activity is a

18  necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

19  Due Process Clause."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Police deception alone

20  "does not render [a] confession involuntary," United States v. Miller, 984 F.2d 1028, 1031 (9th

21  Cir. 1993).  In Illinois v. Perkins, 496 U.S. 292 , 296 (1990), the Supreme Court held that an

22  undercover officer need not give Miranda warnings to an incarcerated suspect before asking him

23  questions aimed to elicit an incriminating response, as such conversations "do not implicate the

24  concerns underlying Miranda."

25         In People v. Webb, 6 Cal. 4th 494 , 525-26 (1993), the California Supreme Court held that

26  a defendant's statements to his girlfriend over a jail telephone were not obtained during custodial

27  interrogation  and thus did not require a Miranda warning.  The Webb court reasoned:

28         Miranda forbids coercion, not mere strategic deception by taking

11

> advantage of a suspect's misplaced trust in one he supposes to be a
> fellow prisoner or ally.   (Illinois v. Perkins, 496 U.S. at 297.)
> Under the circumstances, defendant's tape-recorded statements
> were completely voluntary and compulsion-free.   The trial court
> correctly denied defendant's motion to exclude this evidence under
> the Fifth Amendment.

(Id. at 526.)

Reviewing petitioner's appeal, the state courts concluded that, under Webb, any motion to suppress the McCoy conversation would have been denied.  Similarly, under AEDPA, jurists of reason could conclude that Franco's failure to file the motion was not constitutionally deficient because the motion lacked merit.

Jurists of reason could also conclude that petitioner was not prejudiced by counsel's performance, as suppression of the McCoy conversation likely would not have changed the trial's outcome.  Petitioner's texts and conversation with McCoy the day after the shooting were far more damaging to his case than anything he told her in jail.  In that conversation, petitioner repeatedly denied being present at the shooting, but insisted he had been home and McCoy had been tricked into saying otherwise.

Thus petitioner is not entitled to habeas relief on his ineffective assistance claim.

B.  Insufficient Evidence of Gang Enhancement

Petitioner claims there was insufficient evidence to support the gang enhancement, and by determining otherwise, the state courts made an unreasonable determination of the facts.

Addressing this claim on direct review, the court of appeal reasoned:

> Defendant contends there was insufficient evidence of the gang
> enhancement. He argues the record is "complete[ly] lack[ing] of
> any evidence that the shooting was gang related or gang motivated,
> or that [defendant's] conduct was in any way gang-related." Not so.
>
> We begin with the words of the gang enhancement, which applies
> an increased term of incarceration to: "[A]ny person who is
> convicted of a felony committed for the benefit of, at the direction
> of, or in association with any criminal street gang, with the specific
> intent to promote, further, or assist in any criminal conduct by gang
> members." (Pen. Code, § 186.22, subd. (b)(1).) The facts, in the
> light most favorable to the judgment (which is the standard of
> review for a sufficiency-of-evidence argument) (Jackson v. Virginia
> (1979) 443 U.S. 307, 319), provided sufficient evidentiary support
> for this enhancement. The victim's fiancé and the gang expert both

12

testified the victim was a 29th Street Crip. The mother of defendant's son and the gang expert testified defendant and Newsome were both members of the rival Oak Park Bloods. The victim verbally acknowledged his gang affiliation before the shooting began when he stated, "29th Street." After this acknowledgement, and before the victim was shot, Newsome and defendant yelled out, "nigga, this is Oak Park." Based on this evidence, the jury could reasonably conclude the victim was shot because he was a rival Crip and that defendant orally proclaiming his membership in a rival street gang before the shooting demonstrated that the murder was an act specifically intended to benefit the rival Oak Park Blood street gang.

[FN 3: Defendant's argument that expert testimony alone cannot prove the gang enhancement is a non-starter because the gang expert did not provide all the evidence regarding the gang enhancement.]

(Lod. Doc. 4 at 3-5) (emphasis added).

Petitioner disputes the above finding that he yelled out "nigga, this is Oak Park" or in any way proclaimed his gang membership before Blanks was shot.  Petitioner argues that this finding is not supported by the trial record, and without it, "no reasonable juror could have found that Joyner intended to commit a gang crime."  (ECF No. 1 at 24.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275 & n. 13.

On federal habeas review, the court applies the Jackson standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  Davis v. Woodford, 384 F.3d 628, 639 (9th Cir. 2004), citing Jackson, supra, at 324 n. 16.  Here, the state court set

13

1 │ forth the substantive elements of the gang enhancement under California law.

2 │       Viewing the facts in the light most favorable to the prosecution, the jury could have found

3 │ beyond a reasonable doubt that petitioner participated in a gang-motivated killing.  Sacramento

4 │ gang expert Justin Saario testified that petitioner and Newsome were members of the F.A.B.

5 │ subset of the Oak Park Bloods, and that one of the gang's primary rivals was the 29th Street

6 │ Crips.  (3 RT 714, 718, 725, 729.)  Daminque McCoy also testified that petitioner and Newsome

7 │ were members of F.A.B.  (3 RT 894-895.)

8 │       Blank's fiancé, Damali Smothers, testified that there were a lot of people in the parking lot

9 │ after the club let out on the night of the shooting.  As she and Blanks were walking to the car,

10 │ someone asked Blanks where he was from and he replied "29th Street."  Then the "whole crowd"

11 │ started yelling, "This is Oak Park."  (2 RT 316-319.)

12 │       Sacramento Detective Thomas Shrum testified that he interviewed Smothers the day after

13 │ the murder, and she indicated that two men, one dark-skinned and one light-skinned, started

14 │ yelling "Oak Park" at Blanks.  (3 RT 615.)  Shrum testified that Smothers stated that the light-

15 │ skinned man walked toward Blanks and began shooting him.  In a subsequent photo lineup she

16 │ identified Newsome as the light-skinned man.  (3 RT 616, 618-620.)

17 │       Teresa Cornish, a friend of Blanks who was present at the shooting, recalled at trial that a

18 │ dark-skinned man and another man "were the main ones" advancing toward Blanks.  (2 RT 430-

19 │ 431.)  Cornish described the dark-skinned man as being about nineteen years old, 5'9 or 5'10"

20 │ tall, with a fade haircut.  (2 RT 440-441.)  Petitioner's subsequent actions, such as his texts to

21 │ McCoy, suggested he had been involved in the killing as more than a bystander.

22 │       The prosecution argued in closing that Newsome was the shooter and Blanks was the

23 │ dark-skinned man described by witnesses.  Sufficient evidence was presented for the jury to

24 │ conclude that petitioner was the dark-skinned man walking toward Blanks and yelling "Oak Park"

25 │ at a rival gang member just before he was shot.  As the state court's analysis was not an

26 │ objectively unreasonable application of <u>Jackson</u> or <u>Winship</u>, petitioner is not entitled to habeas

27 │ relief on this claim.

28 │ ////

1    C. <u>Trial Court Erred in Refusing to Bifurcate Gang Enhancement</u>

2           Petitioner claims that his right to due process and a fair trial were violated by the trial

3    court's (1) admission of prejudicial gang evidence and (2) failure to bifurcate the gang

4    enhancement allegation.[3]

5           Rejecting this claim on direct review, the state court of appeal reasoned:

6              Defendant contends his due process right to a fair trial was violated
               when the court admitted gang evidence and failed to bifurcate the
7              gang enhancement allegation.

8              We review an order denying bifurcation for abuse of discretion.
               (<u>People v. Hernandez</u> (2004) 33 Cal.4th 1040, 1048.)  The burden is
9              on the party seeking bifurcation (here, defendant) to show a
               substantial danger of prejudice.  (<u>Id.</u> at p. 1049.)  The trial court
10             properly concluded that the evidence of defendant's gang
               membership was admissible to show motive, was not unduly
11             prejudicial, and therefore no purpose would be served by
               bifurcation.  (<u>Id.</u> at pp. 1049–1050.)  In <u>Hernandez</u>, the California
12             Supreme Court upheld the denial of bifurcation where a gang
               member told a woman just before robbing her and her friend,
13             "'[Y]ou don't know who you are dealing with,'" naming a street
               gang.  (<u>Id.</u> at p. 1045.)  The court found: "Much of the gang
14             evidence here was relevant to the charged offense. Indeed,
               defendant Hernandez himself injected his gang status into the
15             crime. He identified himself as a gang member and attempted to use
               that status in demanding money from the victim." (<u>Id.</u> at pp. 1050–
16             1051.)

17             Here, as the trial court noted, this case presented a "classic [case of]
               gang retaliation." The victim verbally identified as being from 29th
18             Street, which is an affiliate of the Crip street gang. Defendant then
               yelled out this was Oak Park, which was the rival Oak Park Blood
19             street gang. Without this evidence, the shooting would have made
               no sense.   Thus, because the evidence supporting the gang
20             enhancement was admissible at trial to make sense of the shooting
               and thus would have come in anyway, an inference of prejudice
21             was dispelled and bifurcation was not necessary.   (<u>People v.</u>
               <u>Hernandez</u>, <u>supra</u>, 33 Cal.4th at pp. 1049–1050.)
22

23   (Lod. Doc. 4 at 4-5.)

24          The due process inquiry in federal habeas review is whether the admission of evidence

25   was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  <u>See Romano v.</u>

26   _____

27   [3] Petitioner argues that, "as with Ground Two, the state court of appeal made an unreasonable
     determination of the facts in concluding, 'Defendant yelled out this was Oak Park.'"  (ECF No. 1
28   at 25.)  This contention was addressed above.

                                          15

1    Oklahoma, 512 U.S. 1, 12–13 (1994).  "A habeas petition bears a heavy burden in showing a due

2    process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th

3    Cir. 2005).  There is no clearly established United States Supreme Court precedent that defines

4    when the admission of evidence constitutes a denial of due process.  See Holley v. Yarborough,

5    568 F.3d 1091, 1101 (9th Cir. 2009)  ("Although the Court has been clear that a writ should be

6    issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made

7    a clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process

8    violation sufficient to warrant issuance of the writ.").

9         In Windham v. Merkle, the Ninth Circuit found that evidence tending to support the

10   prosecution's gang involvement theory, including testimony by a gang expert, was properly

11   admitted.  163 F.3d 1092, 1103-04  (9th Cir. 2000), overruled on other grounds by Solis v.

12   Garcia, 219 F.3d 922, 929 n. 7 (9th Cir.2000).  The court reasoned that "[t]he admission of 'other

13   acts' evidence, which a defendant contends is unduly prejudicial, will violate due process only

14   when 'there are no permissible inferences the jury may draw from the evidence.'"  The Ninth

15   Circuit found that gang evidence was admissible to "demonstrate Windham's motive for

16   participating in the alleged crimes."  Id. at 1104.  Similarly, here, the state courts reasonably

17   determined that "the evidence supporting the gang enhancement was admissible at trial to make

18   sense of the shooting" and was not unduly prejudicial.

19        As to bifurcation, the Supreme Court has never decided whether a trial court's failure to

20   bifurcate trial on a gang enhancement allegation implicates due process.  However, in Spencer v.

21   State of Texas, 385 U.S. 554, 568 (1967), the Supreme Court noted: "Two-part jury trials are rare

22   in our jurisprudence; they have never been compelled by this Court as a matter of constitutional

23   law, or even as a matter of federal procedure."  The Ninth Circuit has held that there is no clearly

24   established federal law within the meaning of AEDPA setting forth constitutional standards for

25   severance of counts or defendants.  See Collins v. Runnels, 603 F.3d 1127, 1132-33 (9th Cir.

26   2010); Grajeda v. Scribner, 541 Fed. Appx. 776, 778 (9th Cir. 2013) ("The Supreme Court has

27   not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the

28   Constitution.").

1   Federal habeas relief is available only for violations of the Constitution or laws or treaties

2 of the United States.  See 28 U .S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62 (1991).  As

3 petitioner has not shown that the state courts' ruling on this claim was unreasonable under

4 AEDPA, petitioner is not entitled to habeas relief on this claim.

5 D.  Evidentiary Hearing

6   Petitioner seeks an evidentiary hearing on his federal habeas claims.  In Cullen v.

7 Pinholster, 131 S. Ct. 1388, 1398 (2011), the Supreme Court held that federal habeas review

8 under § 2254(d)(1) and § 2254(d)(2) is limited to the record that was before the state court that

9 adjudicated the claim on the merits.  See Sully, 725 F.3d at 1075-76 ("[A]n evidentiary hearing is

10 pointless once the district court has determined that § 2254 precludes habeas relief.").  Thus the

11 undersigned will recommend that the petition be denied without an evidentiary hearing.

12   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

13 habeas corpus be denied.

14   These findings and recommendations are submitted to the United States District Judge

15 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16 after being served with these findings and recommendations, any party may file written

17 objections with the court and serve a copy on all parties.  Such a document should be captioned

18 "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

19 may address whether a certificate of appealability should issue in the event he files an appeal of

20 the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

21 court must issue or deny a certificate of appealability when it enters a final order adverse to the

22 applicant).  Any response to the objections shall be served and filed within fourteen days after

23 service of the objections.  The parties are advised that failure to file objections within the

24 specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

25 F.2d 1153 (9th Cir. 1991).

26 Dated:  November 28, 2016

27

              CAROLYN K. DELANEY

28 2 / joyn1494.hc         UNITED STATES MAGISTRATE JUDGE